United States Court of Appeals for the 11th Circuit. Hear ye, hear ye, hear ye. United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning. We're here to entertain oral argument in one appeal that we had originally scheduled to hear in December, but we continued until today. United States v. Morel, case number 20-14315. Mr. Cohen? Yes, sir. Please speak with us on behalf of your I'm still recovering from a broken leg. I wanted to personally thank the court for that. We have the recoveries going well. It is, Judge. Thank you very, very much. If I may proceed, Your Honor, with the court's permission. Sure. Judge, this is a case in which Tom Sclafani had written the brief initially. Unfortunately, Mr. Sclafani had passed away and the court assigned me to handle this, and it's my pleasure to do so, Your Honor. Mr. Morel has raised three what we think are significant issues. The first case is whether the evidence was sufficient to convict him in his first issue. The second issue was an issue involving a mid-trial jury instruction given by Judge Graham, the district court below, uh, in terms of whether or not that was an abuse of discretion to do so. And the third issue really is related to that issue in that Mr. Sclafani's brief asks whether the court should have granted a new trial under Rule 33 of the Federal Rules of Criminal Procedure. So those are the issues before the court. Why don't we start with the jury instruction, the interruption, because it seems to me that if that was not error, then we can go straight to sufficiency. And if it was error, then we may know where we're going that way too. Yes, sir. So with regard to that particular issue, it arose during the cross examination of the cooperating co-defendants in this case. The co-defendant on trial had asked a question regarding his client as to whether his client had ever directly conspired with the co-conspirators, and the answer was no. Then Mr. Morel's counsel, in essence, asked the same question, saying, all right, did you ever directly conspire with Mr. Morel? And of course, the answer based on the plea agreements entered into by the cooperating defendants was no. It was not objected to, by the way, by government counsel. At that particular point, Judge Graham stepped in and felt that, according to the government's confusion, he should give an instruction, which was the correct instruction under the law of conspiracy, but it was a partial instruction about whether or not it was necessary to conspire with just one person, or could you be guilty of conspiracy if you conspired with others? And the standard instruction... Well, I want to make sure I understand some things about the record. After this testimony about not conspiring, my understanding was there was a sidebar conflict, right? That's correct. And the prosecution asked for an instruction, and then on redirect, elicited from Moreno that he believed that conspired with someone, one had to know the individual personally. It was only then that district court instructed the jury on conspiracy, right? That's correct, and I think that's an accurate recitation of what the record shows. Mr. Sclafani's point on this, Your Honor, was that because of what he felt was the insufficient evidence against the defendant, Morel, on sufficiency grounds, that coupled with the mid-trial instruction of this particular instruction at the time it was given, was what constituted the abuse of discretion. Here's the problem I'm having with this, Mr. Cohen. We have long held... I'll read from a 1983 precedent of our court, United States versus Harris. A trial judge is more than a referee to an adversarial proceeding. Indeed, the judge may question witnesses, comment on the evidence, and interrupt the trial in order to correct an impropriety. The judge's participation is limited only by the need to remain impartial. I'm having difficulty with the idea that an interruption to make clear to the jury, as a matter of law, what a conspiracy is to correct a misstatement of law can be error. I think Mr. Sclafani felt, Judge, in his brief, that that wasn't necessarily offensive conduct. What was offensive was the timing of the instruction, and he said what remedy could exist. The remedy Mr. Sclafani suggested was that the instruction should have been given at the end of the case, because by giving it at the time the court did, it destroyed the most cogent evidence that Mr. Morrell would have had for arguing for acquittal. That was his... Surely the jury, though, does not need to have a lingering misunderstanding about the law throughout the trial, only to be corrected at the end. A district court could exercise the discretion to explain something that fundamental early on, so that as the trial unfolds, the jury is hearing that evidence without a misapprehension about the law. Right. Well, I understand, and there's a great deal of foundation for that point of view, Your Honor. However, from Mr. Morrell's standpoint, we feel that had the court then explained in specific terms what the significance of that instruction was at the end of the evidence, and then referred to the testimony of Morrell and the co-defendant regarding their conspiring with the cooperating co-defendants, that would have been just as effective. The point is, I guess it's almost like a 403 analysis was that more prejudicial than probative at that time. It's not, of course, the law, but I'm just using that as a corollary example. Well, why don't you get to the sufficiency issue? You've only got about three minutes. Sure. Well, I'll be brief, and I think I'll get to the point as quickly as I can. There was a ton, taking the government's point of view, there was a ton of evidence, circumstantial evidence, against Mr. Morrell that he was involved in something that was illegal. Now, we know that the law on this is pretty clear. To convict Mr. Morrell of conspiracy under Section 846, you have to have an agreement between two or more people to commit a crime. He must knowingly and voluntarily join the conspiracy unlawfully. You have to have an agreement. And for our purposes, the most important point, Your Honor, is the government must prove beyond a reasonable doubt that the conspirators had specific knowledge of the conspiracy's unlawful object, meaning a narcotics conspiracy. Thank you, Ms. Tisdale. Yes, we agree. We agree that he got oil for the boat. We agree that there were numerous phone numbers in his phone, which led him to a meeting at 1395 Brickell Avenue and a WhatsApp reference to the location of the house from people in Pennsylvania. We agree he would have driven a car laden with cocaine if they transferred it from the Sea Hunter to the SUV to a destination that he said he had on his phone. There was a lot of that That mean that he was involved with some other illegal venture that was a conspiracy, or did that mean he knew there was a narcotics conspiracy going on? Let me ask you a question, Mr. Cohen, in that regard. This is Judge Marcus. When I was looking at the transcript, particularly of the co-conspirator Paulino, he talks about how he met with Melendez at 1395 Brickell Avenue. He explains in his testimony that there was a delay in hooking up with Melendez. He, in substance, asked Melendez why there was a delay. Among other things, he says the following. He replied to me that there was a little bit delayed because he, that is Melendez, was waiting for some other people that were supposed to be helping us with the Sea Hunter pick up the drugs. So he explains that some unnamed people other than Paulino were supposed to meet on that day with Melendez to We also know specifically that from circumstantial evidence, from the GPS evidence, that your client was at that location at the critical time. Could not the jury reasonably infer from that that your client was there to discuss picking up the drugs with Melendez? This would have been a statement made in the course of an in furtherance of the conspiracy. They could infer that, but I think it's a leap of faith, as Mr. Scalfani said in his brief, to come to that conclusion. Because from the standpoint of the actual record, what did Mr. Morell actually know? As Mr. Scalfani said in his brief, was this a conspiracy for something other than drugs? I think that's where the sufficiency argument has its strongest nexus. And that's why we're saying that the evidence was insufficient to convict him of that fourth element of the conspiracy requirement, which is the object of the conspiracy was a narcotics conspiracy. So that's our position. And of course, issue three flows from that as well. So that would be the position of Mr. Morell, Judge Marcus. And I appreciate having the opportunity to make this argument before the court. Okay, Mr. Cohen, you need to say five minutes for rebuttal. Yes, Ms. Hernandez. Good morning, your honors, and may it please the court. My name is Janae Hernandez, and I represent the United States. I also tried the case below with AUSA Kurt Langenheimer. The court in this case stepped in at just the right time to correct a misrepresentation of law. During cross-examination, the defense used the word conspiracy in a way that misled the jury. They essentially suggested that everyone in a conspiracy has to know each other in order for the government to meet its burden. To correct the record, the court, during the government's redirect, mind you, recited the pattern or recited from the pattern jury instruction specifically on this point as to whether co-conspirators all need to have material discussions about the conspiracy with one another. This was acceptable. Not only was it acceptable, but it was good practices. It was part of the judge fulfilling its role as the trier of fact and providing the jury with the necessary tools in order for it to accomplish its mission, which is to determine the facts. Morell's argument essentially boils down to this. Even when a party's questions mislead the jury on a point of law, a discrete critical point of law that the jury will have to consider in its deliberations, the judge is effectively hamstrung from making that correction and has to let the jury stew with that misrepresentation or that misapprehension of law for days. In this case, it was three days, but you could easily imagine a multi-week, a multi-month trial where a jury would then have to sit with the misrepresentation or the misunderstanding of law for a much, much longer period of time. And that simply cannot be right. Critically, Morell does not argue that the instruction was a misstatement of law, nor can he, considering that this was almost verbatim or very close to verbatim, what the judge recited in its jury at the end of trial. And no one's really arguing that all conspirators need to know each other. That's well-established 11th and Supreme Court precedent. It should be noted that although Morell argues that this somehow eviscerated the most important point in his defense, that's not at all true. The jury still heard and the judge never commented on the truthfulness of what Moreno indicated, i.e. that he had never had any direct communications with Morell during the course of the conspiracy. That's state, and that was a point that the defense raised in its closing. There were no direct communications, and so you can't infer knowledge and intent. Those were all points that the defense scored in its cross-examination, and none of that was affected by the jury's, or excuse me, by the judge's strictly legal correction on that point. I'll turn briefly, unless the court has any questions about the jury instruction point, I'll just address briefly the sufficiency argument. I think the defense relies heavily on the Lewis case in its briefs in order to attempt to draw a parallel between the circumstances of that case and this one, but they ignore a very critical factor. We have insider knowledge. Two co-conspirators testified in this case, both Paulino and Moreno, and Paulino specifically said not, he didn't just discuss the talk about conspiracy-related discussions that he had at the 1395 Brickell Address, but to put an even finer point on it, he specifically said that he had asked Melendez, who was Morell's handler, essentially, or supervisor for the offload. He had asked Melendez, are these two, is Morell here? Is he cleared to be here? That's at docket entry 314, page 82, and Melendez said, yeah, they're cool, they're cleared. Other crucial points of Paulino's testimony was where he said that he had overheard Morell speaking with Melendez, again, the handler, and Morell said, yeah, yeah, yeah, I know where to go. I've got the GPS coordinates, or I've got the coordinates programmed into my GPS, and I know where to take this next. Again, key evidence that was missing in Lewis, which was limited to an external perspective on what was happening. So, and that's really the cap on the bottle, so to speak. Counsel, help me with the facts just a little bit, if you would. Do I have it right that the 420-odd kilograms of cocaine were secreted in the vessel, they were unpacked from the vessel, and they were being stored in four coolers on the vessel, but the dope never left the vessel and went into the house? That is correct, Your Honor, yes. The 388 bricks of cocaine, about 421 kilograms, they were stored, I believe, close to the engine room, and then they were being unpacked from the engine room, put into coolers that were in the main cabin of the vessel when the arrest happened. So when the arrest happened, there were three individuals on the process of packing the bricks of cocaine into the coolers, and then there was Morel in the house, a few feet away from his private. Where exactly was Morel located when the drugs were being unpacked and restored in the coolers on the vessel? So he was in the house. Did we know where in the house he was? He was in the second floor. So the layout of the house was there's an open plan in the center, a sort of living area that has a view to the railing on the second floor. Morel was arrested on the second floor in that railing, but he was inside the house. And then the vessel was parked at a private slip that was exclusive to that house. I don't know exactly how far, but just in the, I suppose divided by like a backyard. And I take it there's no evidence that Morel ever boarded the vessel? No, there was no testimony about whether Morel ever boarded the vessel. But I think it's, you know, speaking about the house, one thing that's important to keep in mind is there was testimony from Paulino that they were all, all six men were there, or excuse me, not all six men, the four men who were accepting the vessel were there an entire afternoon and the arrest took place at 9 p.m. that night. So for an entire afternoon and a good portion of an evening, they were in a house without running water, without food, with a few bottles of water that they had to pack for themselves so that they could drink. And the government introduced barely, you know, persuasive evidence that these were not good conditions to live in. And that this was not part of a criminal conspiracy. I mean, this house had no functioning toilets. This was not something that could be mistaken for, you know, waiting for a barbecue or something along those lines. These men were there for a particular reason. And that's part of the overall circumstances. In addition to Morel, to Paulino's direct testimony that he understood Morel to be there for a particular purpose, which was to drive off with a portion of the of the drugs coming in from the offload. Let me ask you a follow-up question factually. Does the record reflect where the drugs were going to be transported to from that house? That is to say, the exact location of the second house? No, the record did not go into that level detail. What we do have is that testimony from Paulino indicating that Morel had that exchange with Melendez, where Morel said, you know, Melendez asked Morel, do you know what we're going to next? Do you have that location? And Morel said, yeah, I have it programmed in the GPS. Was there any the GPS insofar as it put Morel at the location 1395 Brickell the day before? Was there any additional testimony about what the GPS reflected concerning the second house? So in here, there's a little bit ambiguity, a little bit of ambiguity in the language. It's unclear whether Morel was talking about a physical GPS that he had that he had for his car, or the geolocation data on his phone. What was introduced at trial was the geolocation data from his phone that put him, on July 2nd, traveling down from Belle Glade to the Miami area, close to that 1395 Brickell address. But the government did not introduce, and the record does not indicate, you know, whether there was another location further upstate or something along those lines, which would be the ultimate destination of the drugs. Thank you. So I have a question for you. So it seems to me like the argument, the defendant is more or less, it seems to me, and I guess Mr. Cohen will correct me if I'm misunderstanding, conceding that there's enough evidence to show that Mr. Morel knew that he was involved with something untoward, perhaps, but that the question comes down to whether there's enough evidence that he knew that he was involved with narcotics. And so just if you could summarize for us what you think your best evidence of that is, that would be great. Thank you. Certainly. So I would say really two categories and a doctrine. So first, I would say there is the Paulino testimony, coupled with Moreno's testimony. Paulino's testimony is essentially, I talked to Melendez, we are all in on it, I certainly know it's drugs, I know Melendez knows it's drugs, I want to make sure that Melendez can satisfy me that everyone here involved knows what the name of the game is. And that's essentially what he told the jury. Well, and it's not even so much their knowledge, it's that they can be trusted, right? Exactly. And the way that you can infer from that knowledge, but the reason they're having these conversations, as I understand the record, is because he wants to know that these are all people that believe that they can be trusted. Exactly right, exactly right. But the this conversation a little better is significant. So it's not just a very glossed over, can these guys be trusted? At one point, Paulino also said, you know, that Melendez told him, well, the name specifically escapes me, I think it was Mike or Migs or something like that, sent them, right? Micas, right? Micas. Micas, exactly. Sent them. Micas being the contact in the Dominican Republic. So it's not just a matter of being, can these guys be generally trusted as a matter of, you know, their blood relatives or something like that? No, no, no. They are being sent by a contact in the Dominican Republic. So these are ties. Murrell, through Melendez, is being tied to other key members of the conspiracy, which is something that the jury can certainly consider in evaluating whether they whether he has the requisite knowledge about the not just that they're engaging in some criminal conduct, but that this conspiracy is about drugs. I think that's key. You refer to the doctrine, the doctrine being the prudent smuggler. Precisely, precisely. And so, and I think these two points, interestingly enough, in this case, they intersect Paulino's testimony and the prudent smuggler doctrine, because the second part of Paulino's testimony is effectively the prudent smuggler doctrine. Can these guys be trusted? Right. I mean, a prudent smuggler is not going to suffer uninvolved parties being present at the offload of not just a large quantity of drugs, but eleven point five million dollars worth of drugs. The quantity is certainly something that the jury could have taken into account as part of the nature and circumstances. Two minutes, please. Thank you. All of these circumstances factor into the prudent smuggler doctrine. And interestingly enough, Paulino and Moreno both effectively echoed the rationale from an insider's view, effectively echoed what the court in Cruz Valdez said about how these sophisticated drug smugglers operate. That's what gets you outside of the realm of, you know, generally can Morel be trusted? Generally, can he know, does he know he's part of a conspiracy? No, it's not just limited to that. It's can he be trusted in this drug conspiracy? And separate and aside from that, the final category is just the GPS data, the conditions in the house, all of these other totality of the circumstances really support the view that not only did he know he was engaging in wrongdoing, but he knew that this was a conspiracy about drugs specifically. Okay, Mr. Hernandez, I appreciate your argument. And we'll now hear rebuttal. We've got five. May I proceed? Yes. Uh, I think the court is is correct in that I am conceding something was going on by virtue of the circumstantial evidence. But again, our position is it's a leap of faith to go beyond the fact that Mr. Morel knew there was something. This was a conspiracy necessarily involving narcotics. Um, we do think I'm sorry, or cocaine. Yes, cocaine, cocaine specifically, as opposed to narcotics. This was a situation involving a large amount of cocaine. I think if I heard correctly, Judge Marcus was talking about the location of Mr. Morel. Um, I hope I've identified that voice correctly. Mr. Morel was on the second floor of the home in Fort Lauderdale when the assault took place. There's no indication he ever went on the vessel. There's no indication he ever saw what was being taken off the vessel and coolers. I'm sorry to interrupt. But if I could, let me just redirect your your answer just a little bit. Ms. Hernandez says, has explained what she thinks is the best evidence that your client knew that there were narcotics and she's combined it with the prudent smuggler doctrine. And I wonder if you want to explain to us why it is that you think that's not enough? Well, the prudent smuggler doctrine is kind of an objective way of saying, if there's so much money involved with cocaine, certainly the defendant must have known that something inappropriate regarding an actual cocaine conspiracy was going on. In this particular case, we disagree with that. First of all, the contacts that Mr. Morel received were from Pennsylvania, not from the Dominican Republic. They were WhatsApp communications between a man named Kendo, apparently there, who provided him with some of the addresses. So so there is some inconsistency in terms of where the where the information is coming from, whether it's from Pennsylvania. And I think the people from Pennsylvania rented the vehicles, the SUV, if I'm not mistaken, in this particular case. So there's not even consistency as far as the government's argument is concerned as to where the directions were coming from. The fact that one of the co-conspirators say he's a friend, he wouldn't be wouldn't be here, but for the fact that a friend sent him is is is equivocal. It's not unequivocal that these statements are statements of people to reassure themselves that Mr. Morel wouldn't be there if there wasn't something inappropriate going on. And I conceded that may be so in terms of a conspiracy to, let's say, you know, possess counterfeit currency, as the case might be, or some other illegal aspect of the case. But it doesn't necessarily show that he was involved in a cocaine conspiracy. Let me ask you, Mr. Cohen, let me ask you a question that going beyond the reference to the friends. When I looked at Paulino's testimony, there was an interesting discussion where he says that at one point he and Melendez are on the boat, they're packing the cocaine into the coolers that Melendez brought on the boat, and that he, Paulino, got tired. It was late at night. Well, I got tired. And I said, Listen, those guys going to help us referring presumably to the people in the house. And he says to Melendez, what do you bring them for? Question, who are you speaking to Melendez? Who are you referring to? Martinez and Morel? I was asking if Morel had already arrived. He hadn't seen him. So what happens? I asked Melendez, Melendez told me to go inside the house and bring anyone there. So Melendez is instructing Paulino to get Morel and Martinez to come on the boat to assist the task of packing the cocaine. Melendez is a key figure here. Why couldn't the jury infer from that? That Melendez obviously perceived Morel as a knowing participant in this dope conspiracy rather than an unwitting dupe? Right? Well, he may have perceived them as such, Your Honor. But the question was, what did Morel know? And what did he not know? Apparently, his main task here was to drive the contraband to a location which he had pre-programmed in his phone. So what one co-conspirator believes may have been the case. Well, I guess I'm asking, let me sharpen the question. Why would a principal co-conspirator, Melendez, instruct Paulino to bring Morel into the boat to assist with the packing and unpacking of the cocaine if he wasn't a knowing participant? Well, I think the answer is the proof of the pudding is in the eating, as you say, and I don't think he ever went on the boat. So once again, that may have been the belief of Melendez and Paulino. That doesn't mean that Mr. Morel actually had the knowledge that this was a co-conspirator. Well, isn't the reason Morel didn't go on the boat was he wasn't there, he had gone to get oil for one of the engines which had run dry? Right. I don't think it's clear as to when that took place. Clearly, he said he was a truck driver, he was going to get the oil. For some reason, the people in the Dominican Republic didn't want the other co-conspirators to get that oil and word came down from them that it ought to be somebody else. And so that's, as I recall, the record. And I think that's why he got the oil. But in any event, it's unclear as to what he knew or didn't know about the actual contraband itself. And then quite quickly, just to wrap this up, we think the Lewis case is an important distinction where the court found there was no sufficiency regarding Lewis's as a driver's knowledge of the two boxes that were placed in his car. And don't forget, in that case, when he was apprehended outside the gates of the dock, he ran away, which would show guilty knowledge. So we think in a case like Lewis, where there was no sufficiency found by unanimous panel, that's even a Schrodinger argument for Mr. Morel's position that he ought not to be held liable under the basis of the sufficiency of the evidence. He would be my position regarding this case, your honors. Thank you, Mr. Cohen. You've gone over, but you answered questions from before. So we have your case and we will adjourn now. Thank you very much. Thank you. And again, my heart. Thank you. I wanted to thank you for wanting. And it's my privilege and my honor to do so, Judge. Thank you, Mr. Cohen.